Gordon ETHRIDGE, Appellant,

v.

Michael J. GALLAGHER, Defendant ad litem for Daniel J. Cates, Deceased, Respondent.

No. WD 41142.

Missouri Court of Appeals, Western District.

June 27, 1989.

Phillip S. Smith and Thomas Stein, Kansas City, for appellant.

Dale L. Beckerman and Mimi E. Doherty, Kansas City, for respondent.

Before KENNEDY, C.J., and GAITAN, J., and CONNETT, Special Judge.

GAITAN, Judge.

Appellant, Gordon Ethridge, appeals the giving of Instruction No. 9, a verdict directing instruction on comparative fault, to the jury. The instruction gave four disjunctive submissions of negligence which were: (1) rear-end collision; (2) excessive speed; (3) failure to keep a careful lookout; and (4) failure to stop, swerve or slacken speed. Ethridge also contends the trial court erred by instructing the jury panel that respondent, Daniel J. Cates, died thirteen days after the collision. Lastly, Ethridge alleges that the trial court erred in allowing Cates' attorney to elicit testimony that a freezer in the back of Cates' vehicle had been jarred loose by the impact and had pinned Cates down, preventing him from giving a statement. The jury verdict assessed 70 percent fault to Ethridge and 30 percent to Cates.

The judgment of the trial court is affirmed.

This case involves a suit for property damage and personal injuries allegedly sustained in a collision between vehicles driven by Ethridge and Cates on September 4, 1985. Both vehicles were northbound on Highway 7 in Blue Springs, Missouri, at the time of the collision. The dump truck that Ethridge was driving struck Cates' ice cream van from the rear.

At the outset of voir dire, the trial judge made the following statement to the jury panel:

The case that you are going to be asked to oversee as a juror, if you are ultimately selected, is a civil case that involves an automobile accident, and the plaintiff—one of the defendants in this case, Mr. W. Faye Cates, died within about 13 days after this accident occurred. And under the law, it is required that a defendant ad litem, a representative be appointed to represent his interest in that case and it has been done, but obviously he will not be here to testify in the case but he is represented through a defendant ad litem.

There was conflicting evidence as to the location and movement of Cates' vehicle immediately prior to the accident. Ethridge and two young girls who were walking down Highway 7 at the time of the collision, testified that the ice cream van had been stopped on the west side of Park Road at its intersection with Highway 7

and then turned left and pulled out in front of Ethridge in the northbound lane of travel on Highway 7.

There was also testimony that Cates was traveling northbound on Highway 7 and had not turned off of Park Road onto Highway 7. Barbara Friend, a witness for Cates, testified that immediately prior to the accident she was driving southbound on Highway 7 toward Park Road and toward the parties' oncoming vehicles and saw both the Cates' van and Ethridge's dump truck traveling north on Highway 7. She was going about 35 miles per hour. Ms. Friend stated that the Cates vehicle was going very slowly when she saw it. As she approached the intersection of Park Road and Highway 7 from the south immediately before the accident, she had her eyes trained on the road in front of her for five or ten seconds. In that time, the Cates' vehicle did not cross her lane or make a turn in front of her from Park Road onto Highway 7. When Ms. Friend entered the intersection, she stated that the vehicles were "so close to each other" that she realized a collision was imminent. She heard the collision as she left the intersection.

In addition, shortly after the collision, Ethridge spoke with the investigating police officer, Ken Gentry, and told Officer Gentry only that Cates' ice cream van suddenly appeared in front of him. Ethridge did not tell Officer Gentry that he had seen Cates' vehicle stopped on Park Road or that the vehicle had turned left off Park Road. The day after the accident, Ethridge twice told Kevin Kirby, an investigator for Delight Wholesale Company, the owner of the Cates vehicle, that he just looked up and the ice cream van was in front of him. Again, he did not say anything about seeing the van stopped at the stop sign on Park Road.

Manuel Andres was called by Cates' attorney as an expert witness. Officer Andres is a Kansas City police officer who has nineteen and one-half years experience in the department's Traffic Specialist Unit (formerly known as the Accident Investigation Unit). Officer Andres is trained in measuring and calculating minimum speeds from skid marks left by vehicles. There was evidence that Highway 7 has been resurfaced since the accident and before Officer Andres' involvement in the case. The investigating officer, Ken Gentry, did not measure the grade or slope of Highway 7 as it approaches Park Road on the day of the accident, but estimated that it was six or seven percent. Officer Andres testified that he had experience estimating grades of roadways from photographs, and had the opportunity on many occasions to compare his estimates with the actual results in the field and that those comparisons were "real" close. Over objections that the testimony called for conclusions and speculation, Officer Andres estimated the grade of Highway 7 from a photograph of the location which had been previously identified by Officer Gentry as a fair and accurate representation of Highway 7 at the time of the accident. The trial court ruled that Officer Andres had already been qualified as an expert and that his credibility could be questioned on cross-examination. Officer Andres estimated the grade at five or six percent.

Officer Andres further explained that in calculating minimum speeds, one needs to know the length of the skid marks and the friction of the roadway. Officer Gentry had previously testified that he had measured from the first skid mark to the last one laid down by Ethridge's dump truck and found the length to be 157 feet and 11 inches.

Officer Gentry had testified that the road surface of Highway 7 at the time of the accident was what is commonly described as traveled asphalt. The description of a road surface as traveled asphalt permitted Officer Andres to estimate the coefficient of friction. Officer Andres has previously estimated coefficients of friction for traveled asphalt from reports and has had opportunities to confirm his estimates with actual field results. His estimates have been within the recommendations of friction factors. Coefficients of friction are expressed in ranges to account for variations in road surfaces. The range of coeffi-

cients of friction that Officer Andres used for traveled asphalt is 55 to 70 percent.

From those figures, and adjusting the coefficients of friction for grade, Officer Andres testified in response to a hypothetical that the range of minimum speeds of Ethridge's vehicle was between 47.97 miles per hour and 54.80 miles per hour. The speed limit on Highway 7 at the time of the collision was 45 miles per hour.

Officer Andres also testified that Ethridge's vehicle had additional speed because Ethridge's vehicle overtook and struck Cates' moving vehicle and because of the extent of the damage to the vehicles. According to Officer Gentry, the Cates vehicle ended up 45 feet from the point of most of the debris. The impact was sufficient to dislodge a freezer in the van. Additional speed calculations were not made.

Officer Andres also calculated Ethridge's total stopping distance to be 277.5 feet at 54.80 miles per hour and 262 feet at 47.97 miles per hour, using the lower coefficient of friction as adjusted for grade. He further testified that Ethridge's total stopping distance at the speed limit of 45 miles per hour would have been from 204.41 feet to 226.7 feet depending on the coefficient of friction. Officer Andres testified that in his opinion if Ethridge had been traveling 45 miles per hour and had begun to react to a hazard when he was 262 feet back he would have been able to come to a total stop by the time he reached the intersection.

There was also evidence that a vehicle traveling north on Highway 7 would have had a clear view of the Park Road intersection. Officer Gentry testified that Park Road could be seen by a northbound driver for quite a distance. Ethridge testified that he traveled a few hundred feet after seeing the van before he realized that it was a danger to him. He stated that the van was midway through the southbound lane of Highway 7 before he realized it was threat to him. He estimated that his vehicle was 200 feet from the van when he began braking.

The dimensions of the roadway and the physical features of the property immediately adjacent to Highway 7 were the subject of both testimony and exhibits. Officer Gentry testified that Highway 7 was 24 feet wide from curb to curb. Exhibit 1 showed that a centerline evenly divided the highway. Officer Gentry further testified that the stop sign protecting Highway 7 from eastbound traffic on Park Road was 21 feet from the west curb line of Highway 7. There were ditches on both sides of Highway 7.

 Ethridge's first four points on appeal contend that the trial court erred in giving Instruction No. 9 to the jury because a submissible case had not been made for the four alternative theories of negligence in that instruction. Instruction No. 9 states as follows:

In your verdict you must assess a percentage of fault to plaintiff whether or not Daniel J. Cates was partly at fault if you believe:

First, either:

plaintiff drove at an excessive speed, or

plaintiff's automobile came into collision with the rear of Daniel J. Cates' automobile, or plaintiff failed to keep a careful lookout, or plaintiff knew or by the use of the highest degree of care, could have known that there was a reasonable likelihood of collision in time thereafter to have

stopped, or

swerved, or

slackened his speed,

but plaintiff failed to do so, and

Second, plaintiff in any one or more of the respects submitted in Paragraph First was thereby negligent, and

Third, such negligence directly caused or directly contributed to cause any damage plaintiff may have sustained.

There must be substantial evidence to support each element of a disjunctive negligence instruction or else the submission of the entire instruction is rendered erroneous. *McCreary v. Conroy,* 611 S.W.2d 234, 235 (Mo.App.1980). Just as the plaintiff is entitled to the benefit of all favorable inferences in determining submissibility,

the defendant is entitled to have all evidence considered in the light most favorable to his comparative fault submission and is given the benefit of any favorable inferences. *Id.* at 234. Plaintiff's evidence must be disregarded unless it tends to support the grounds of comparative fault submitted in the instruction. *Id.* We believe that there was substantial evidence to support each element of Instruction No. 9.

Ethridge first contends that the rear-end collision doctrine is inapplicable because there was undisputed and uncontradicted evidence that Cates was not proceeding northbound on Highway 7 at all times prior to the collision. We disagree.

The rear-end collision doctrine recognizes that if one has his vehicle in a portion of the highway where he should have it in view of his course, and another traveling behind him in the same direction overtakes him and permits his vehicle to run into the rear of the one ahead, proof of the collision under such circumstances makes out a *prima facie* case of specific negligence against the driver operating the overtaking vehicle. *Porter v. Bi–State Development Agency,* 710 S.W.2d 435, 436 (Mo.App. 1986). The rear-end doctrine is not limited to situations where both plaintiff and defendant are traveling in tandem along a highway and the following vehicle runs into the rear end of the lead vehicle while attempting to overtake it. *Barlow v. Thornhill,* 537 S.W.2d 412, 420 (Mo. banc 1976). The doctrine applies when a rear-ended plaintiff is parked, is stopped in a line of traffic or is stationary at a traffic signal. *Id.* at 421. The doctrine also applies when a vehicle is stopped and waiting to turn left. *Forbis v. Associated Wholesale Grocers, Inc.,* 513 S.W.2d 760, 763 (Mo.App.1974). Therefore, the rear-end collision doctrine applies to some accidents which occur in or near intersections.

In the case at bar, there was conflicting evidence as to whether Cates' vehicle made a turn onto Highway 7 in the path of Ethridge's vehicle or whether Cates' vehicle had already been on Highway 7 and was slowing to make a turn onto Park Road. Both scenarios were supported by substantial evidence. The resolution of the conflicting evidence is for the jury. *Lewis v. Envirotech Corp.,* 674 S.W.2d 105, 111 (Mo.App.1984). Therefore, the rear-end collision doctrine instruction was properly submitted to the jury.

The second point on appeal is that the trial court was erroneous in submitting the excessive speed instruction in that Officer Andres' testimony was premised on speculative conclusions and opinions and that he failed to make a definitive finding as to the coefficient of friction on the road surface upon which the accident occurred. Additionally, Ethridge contends that Officer Andres erroneously used a photograph to determine the grade of roadway. It is well-established that the admission of expert testimony is within the sound discretion of the trial court and will not be disturbed on appeal absent a showing of abuse of discretion. *Maples v. Charles Burt Realtor, Inc.,* 690 S.W.2d 202, 213 (Mo.App.1985). Here, we believe that the evidence concerning Officer Andres' qualifications and basis of his opinions fully supported the admission of his opinions.

A qualified expert witness may consider facts which are related to him in a hypothetical question or are within his personal knowledge and give his conclusions or opinions based on that information. *Cheek v. Weiss,* 615 S.W.2d 453, 456 (Mo.App.1981). The factual underpinnings of an expert witness' opinion go to the weight and credibility rather than admissibility. *Wadlow by Wadlow v. Lindner Homes, Inc.,* 722 S.W.2d 621, 627 (Mo.App.1986). Similarly, objections as to the substantiality of the evidence an expert relies on go to the weight of the testimony rather than the admissibility. *Ideker, Inc. v. Missouri State Highway Commission,* 654 S.W.2d 617, 625 (Mo.App.1983).

The determination of the qualifications of a witness is within the discretion of the trial court. *Cheek,* 615 S.W.2d at 456. Here, the trial court found that Officer Andres was qualified as an expert on minimum speeds. The trial court's determination that Officer Andres was qualified to give opinions on this subject is supported

by substantial evidence. Therefore, the trial court properly allowed Officer Andres to estimate the grade and a range of coefficients. Although Officer Andres could not give exact percentages for the grade and coefficient of friction, Ethridges' objections to the testimony of the minimum speeds go to the weight and credibility of his testimony rather than its admissibility. *Wadlow by Wadlow*, 722 S.W.2d at 627; *Ideker*, 654 S.W.2d at 625.

The third point raised by Ethridge is that the trial court erred in submitting the instruction on failure to keep a proper lookout. The question of whether a driver kept a proper lookout is usually one for the jury. *Kaelin v. Nuelle*, 537 S.W.2d 226, 233 (Mo.App.1976); *Clark v. McCloskey*, 531 S.W.2d 36, 37 (Mo.App.1975).

In the case at bar, there was sufficient evidence to submit the question to the jury. Under Ethridge's version of the accident Cates turned left onto Highway 7 into Ethridge's path. Ethridge testified that he first realized Cates' vehicle presented a danger when he was about 200 feet away, and at that time Cates' vehicle was midway through the southbound lane of the "T" intersection. Ethridge testified that he was traveling at 40 to 45 miles per hour. Officer Andres testified that at the maximum speed of 45 miles per hour, the total stopping distance would have been between 204.41 and 226.7 feet. From this evidence, the jury could have concluded that had Ethridge observed Cates' vehicle from his initial departure at the stop sign, and reacted before the vehicle was halfway across the "T" intersection, then Ethridge could have stopped his vehicle short of a collision.

Under the other version of the accident Cates' vehicle was northbound on Highway 7 at all times. There was no evidence of a sudden stop by Cates. Ethridge testified that the intersection was visible for several hundred feet. As noted above, at 45 miles per hour, Officer Andres testified that the total stopping distance would have been between 204.41 and 226.7 feet. From this evidence the jury could have concluded that there was a visible, slow-moving north-bound vehicle in front of Ethridge and that given several hundred feet of visibility, Ethridge could have stopped had he kept a careful lookout. Therefore, the submission of the lookout instruction to the jury was proper.

Ethridge's fourth point is that the trial court erred in giving the instruction for failure to stop, slow or swerve. The giving of this instruction is appropriate where the evidence shows that the party charged with the failure had sufficient time, distance, means and ability to avoid the collision but failed to do so. *Morgan v. Toomey*, 719 S.W.2d 129, 133 (Mo.App.1986); *McCreary v. Conroy*, 611 S.W.2d 234, 235 (Mo.App. 1980). The evidence as stated above supports the giving of the failure to stop instruction.

It has also been held that where a driver has time to stop, he also has time to swerve. *McCreary*, 611 S.W.2d at 235. In the case at bar, the evidence presented shows that the area to the east of Highway 7 provided sufficient space for a northbound vehicle to swerve. Therefore, the jury could have concluded that Ethridge could have avoided the collision by swerving. Accordingly, the giving of the instruction of failure to stop, slow or swerve was not in error.

The fifth point raised relates to the prefatory remarks given to the jury panel before voir dire. The actual statement made to the jury panel was that "one of the defendants in this case, Mr. W. Faye Cates [sic], died within 13 days after the accident." As indicated, the trial court erroneously stated that the deceased defendant was W. Faye Cates instead of Daniel J. Cates. W. Faye Cates is the deceased defendant's mother. Even assuming that the jury panel understood that they were being told that Cates died, the remarks were not in error. The trial court was merely informing the jury panel that a defendant *ad litem*, Michael J. Gallagher, had been appointed.

Where evidence in a case is of a "character that might easily lead to the raising of a false issue, the court ought to guard against such an issue by appropriate in-

structions." *Sampson v. Missouri Pacific Railroad Company*, 560 S.W.2d 573, 584 (Mo. banc 1978) (quoting *Estes v. DeShoyers Shoe Co.*, 155 Mo. 577, 56 S.W. 316, 319 (1900)). Such is the case here.

In the case at bar, there was no argument over the fact that Cates died thirteen days after the accident and as a result he was unable to give a statement or be present at trial. Without explanation, those facts could have caused the jury to infer that Cates had an irresponsible attitude about the accident and subsequent lawsuit. The trial judge's remarks prevented such an inference or issue in the jury's mind.

█ The last point on appeal is that the trial court erred in allowing Officer Gentry to testify that a freezer in the back of Cates' vehicle had been jarred loose from the impact and had pinned Cates down, preventing him from giving a statement. The determination of relevance or remoteness of evidence is within the discretion of the trial court. *Modern Graphics, Inc. v. Belger Cartage Services, Inc.*, 668 S.W.2d 111, 114 (Mo.App.1984); *Gant v. Hanks*, 614 S.W.2d 740, 744 (Mo.App.1981).

In the case at bar, the testimony regarding the physical condition of Cates immediately following the collision was relevant in that it clarified why Cates did not give his version of how the collision occurred. The fact that the freezer inside Cates' van was jarred loose by the impact was relevant to show the force of the impact and the extent of the damage that the dump truck inflicted on Cates' van. Additionally, that evidence went to the speed of Ethridge's vehicle.

There was no attempt to go into the details of Cates' injuries or subsequent death. Nor was there an attempt to elicit facts that would arouse the sympathies of the jury.

The trial court acted within its substantial discretion in permitting this evidence and therefore appellant is not entitled to a new trial.

The judgment of the trial court is affirmed.

All concur.